**In re RED CEDAR CONSTRUCTION
COMPANY, INC., Debtor.**

**EAST LANSING STATE BANK, a State
Chartered Michigan Corporation,
Plaintiff,**

v.

**RED CEDAR CONSTRUCTION
COMPANY, INC., a Michigan
Corporation, Defendant.**

**Bankruptcy No. NL 84–02876.
Adv. No. 86–0108.**

United States Bankruptcy Court,
W.D. Michigan.

June 6, 1986.

Carruthers & Halverson Assoc., R. Bruce Carruthers, Lansing, Mich., for plaintiff.

Lick, Emery, Devine & Mallory, P.C., David M. Lick, Lansing, Mich., for defendant.

## OPINION

DAVID E. NIMS, Jr., Bankruptcy Judge.

This adversary proceeding was begun as four separate law suits in the Circuit Court for the County of Ingham, Michigan. The Circuit Court actions were known as: *East Lansing State Bank v. Red Cedar Construction, Inc.*, (File No. 82–30776–CK), *East Lansing State Bank v. Red Cedar Construction, Inc.*, and *National Bonding and Accident Insurance Company* (File No. 82–30741–CK), *National Bonding and Accident Insurance Company v. Red Ce-dar Construction, Inc., John A. Fischer and Lorna J. Fischer v. East Lansing State Bank* (File No. 83–50310–CK) and *John A. Fischer and Lorna J. Fischer, a/k/a Lorna Jean Fischer v. East Lansing State Bank, a Michigan Banking Corporation* (File No. 84–53300–CH). With the exception of the claims of and against National Bonding and Accident Insurance Company, the cases were consolidated and removed to this court for trial. Trial was held on April 8 and 9, 1986.

The cases were consolidated for the reason that they each involve common issues of fact and law. Each action arises out of the failure of East Lansing State Bank ("ELSB") to either extend credit to the debtor (Red Cedar Construction Co.), or to subordinate its liens on debtor's property to the interest of the National Bonding and Accident Insurance Company ("National"). In short, debtor alleges that the actions of ELSB were wrongful and caused debtor's financial ruin. Debtor seeks various damages including the avoidance of all outstanding debts to ELSB, the restoration to debtor of debtor's net worth on the date the loans were refused and sufficient monies to pay off additional loans made to debtor by National. The principals of debtor, John Fischer and Lorna Fischer, who guaranteed several of debtor's loans, also seek to have their guarantees voided. In an action still pending in state court over which this court does not have jurisdiction, National seeks subordination of ELSB's liens and return of monies paid to ELSB with respect to those liens.

## STATEMENT OF FACTS

Debtor's relationship with ELSB began as far back as 1967, when John Fischer, on behalf of debtor, approached ELSB for a business loan. ELSB made the loan and debtor successfully repaid it, and over the course of the next ten or twelve years, several more loans were made to and successfully repaid by debtor. John Fischer testified that from 1972 to 1978 his company was never refused financing by ELSB. He described a relationship with ELSB that

was friendly, professional and mutually beneficial. He knew the officers of ELSB personally and dealt with them on a first name basis. In short, ELSB was Fischer's bank of first resort for his company's banking needs. He felt he had established his credibility and integrity with ELSB, and he looked exclusively to ELSB for commercial credit.

Beginning in approximately 1979, debtor began to experience serious financial difficulties. Debtor was in the business of building "wet bridges" (bridges that span water ways) and in 1979 the demand for wet bridges, and for all road construction generally, became seriously constricted in Michigan. As a consequence, Debtor's accounts receivable began to dry up and cash flow became very tight. As was his practice, John Fischer approached ELSB for help.

Kenneth Ayotte, Vice President of ELSB in 1979 and the loan officer assigned to the Red Cedar account, testified that John Fischer came to him in late 1979 or early 1980 for a working capital loan. At that time, debtor had an indebtedness to ELSB in the principal amount of approximately $450,000.00. According to Mr. Ayotte, when presented with an application for supplemented commercial credit, it was the Bank's practice to thoroughly review the financial condition of its customer. This review, referred to as a debt equity analysis, is made because "the ability of the equity, the worth to support the level of indebtedness has to be addressed." (Ayotte deposition at Page 15). Mr. Ayotte's review of the Red Cedar file revealed that Red Cedar's debt/equity ratio had grown increasingly worse over the previous four years. In 1975, Red Cedar had a net worth of $204,000.00 and total liabilities of $305,000.00 (for a ratio of approximately ⅔), but by 1979 the net worth was $404,000.00 and total liabilities were $833,000.00 (for a ratio of approximately ²/₄). His review of the Red Cedar file also revealed that Red Cedar was having difficulty retiring current debt. It was clear, then, that Red Cedar was in need of additional funding and Mr. Ayotte agreed to accommodate the company. Mr. Ayotte proposed to Mr. Fischer a $575,000.00 revolving credit restructuring loan with monthly "interest only" payments. The proceeds of the loan would be used to fully pay down existing indebtedness, with the surplus being used by the company as working capital. The principal amount of the loan would be due in full in two years. The loan was closed on March 31, 1980.

Unfortunately, the 1980 loan proved to be insufficient, and Mr. Fischer was back in the bank in early 1981 seeking additional funding. He testified that he requested as much as $200,000.00 in early 1981. In response to the request, Mr. Ayotte again proposed a complete restructuring of debtor's debt portfolio. It was Mr. Ayotte's opinion that, based on Mr. Fischer's financial statements, contract commitments and profitability projections, the proposed debt restructuring plan was a "prudent decision on the bank's part." (Ayotte deposition at Page 30). He, therefore, presented the plan to the Board of Directors where it was eventually approved.

The plan was to work essentially as follows: Debtor would borrow $550,000.00 from ELSB which would be 82% guaranteed by the Small Businessman's Association ("SBA"). Of the $550,000.00, $425,000.00 would be paid to ELSB to reduce existing indebtedness. An additional $100,000.00 would be used to pay down accounts payable. The remaining $25,000.00 would be used as "operating capital". In addition to the $550,000.00, ELSB agreed to loan debtor an additional $150,000.00, to make the total amount borrowed $700,000.00. This latter amount was neither required nor guaranteed by SBA, and was payable in 90 days.

The parties are in strident disagreement about the purpose of the $150,000.00 portion of the restructured loan. It is the bank's position that the $150,000.00 was to be distributed back to the bank in partial payment of the 1980 loan. The bank argues that the debtor owed the principal sum of $575,000.00 to the bank, and the

$150,000.00 plus the $425,000.00 referenced above would, if distributed to the bank, fully pay down the principal amount of the prior loan and thereby complete the restructuring purpose of the transaction. Debtor alleges, however, that oral representations were made to him (that is, to John A. Fischer) that the $150,000.00 would be available as "working capital". Mr. Fischer argues essentially that the restructuring plan should have increased the debtor's total indebtedness to ELSB to $850,-000.00, rather than merely $700,000.00. For whatever probative value it may have, it is noted that in August of 1981, Mr. Fischer presented financial information to ELSB which showed that he had a personal net worth of $715,150.00. Mr. Fischer personally guaranteed all loans he received from ELSB. The new loan was closed on November 11, 1981, and the $150,000.00 was in fact distributed to the bank in satisfaction of debtor's pre-existing debt.

The bank argues that it was not reasonable for Mr. Fischer to come to the closing of the restructured loan with the impression that he would be receiving the $150,-000.00 as working capital. Mr. Ayotte testified that he repeatedly explained that the $150,000.00 would have to be used to retire old debt. Mr. Ayotte's testimony went as follows:

"Q. Did you have some disagreement with Mr. Fischer about disbursement of any funds pursuant to the $150,000.00 line of credit that was agreed to in addition to the SBA insured loan?

"A. Here again, I go back to, many, many discussions with Mr. Fischer that the total level of indebtedness comprised the SBA loan and the $150,000.00, for a total of $700,000.00.

"Q. Right.

"A. Recognizing the existing indebtedness and their requirement to pay payables, Mr. Fischer did have a hard time of understanding that.

"Q. What I'm getting at is, did you get the idea that Mr. Fischer misunderstood that the $150,000.00 would not be new money available to him, it would only be money that he had previously had available to him in the $575,000.00 figure which he had already borrowed up to?

"A. The number of times that this was illustrated and discussed with Mr. Fischer, a reasonably prudent person would have no reason to expect any misunderstanding."

Ayotte deposition at Page 61–63.

Mr. Ayotte further testified that in addition to explaining the Bank's intentions for allocating the $150,000.00, he also had repeated conversations with Mr. Fischer about the concept of working capital generally, and that Mr. Fischer was simply unable to understand that concept. In Mr. Ayotte's opinion, Mr. Fischer viewed the bank's support of working capital as a "never ending well". (Ayotte deposition at Page 22). It was "on numerous occasions" explained to Mr. Fischer that working capital had to be generated internally by the company, but Mr. Fischer either would not or could not understand that proposition.[1]

Mr. Fischer was convinced that when he went into the closing on November 11, 1981, he would receive $150,000.00 for future operating expenses. He testified that,

1. Mr. Ayotte's testimony on this point was as follows:

"Q. When Mr. Fischer, then, used his misconception, in your view, of working capital, what was he referring to, as best you could determine in conversions with him?

"A. On numerous occasions, and I want to emphasize the numerous.

"Q. Okay.

"A. This took place at the bank, his office, my house when he would come over, as I recall one evening. I believe he viewed bank's support of working capital as a never-ending well. This was repeated, like I say, so often, that

internal discipline and internal management of cash and cash flow was essential.

"Q. In the period prior to March 31 of 1980 when the first restructuring took place, had you seen evidence of this attitude in Mr. Fischer and in this work, that is, his running of the business, or was that something that occurred after?

"A. It was evident, but I believed it was remediable. Frankly I still find it hard to imagine an intelligent person, as I recall he's a graduate of Notre Dame, not understanding that very basic concept. Like I say, in fact, I don't understand his lack of understanding."

during a pre-closing meeting at the SBA office in Detroit, Mr. Ayotte said that the $150,000.00 would be available for working capital purposes. He testified that the SBA loan officer, Alex Yovan, expressed his approval of this use of the money because, in his (Mr. Yovan's) opinion, many construction businesses fail for want of working capital. In further support of his position, Mr. Fischer introduced into evidence a letter from Mr. Ayotte to Mr. Yovan in which Mr. Ayotte said, "The restructuring of the existing debt to include the proposed [$550,000.00] ten year term loan, as well as, the commitment of this bank to loan an additional $150,000.00 for working capital/bid check accommodations ..." Defendant's Exhibit No. 3.

John Fischer testified that he and his wife, Lorna, arrived at the bank for the closing on November 11, 1981, at approximately 10:00 a.m. The closing documents were not quite ready when they arrived and the closing did not begin until some time after noon. Mr. Fischer testified that he was greatly disturbed when he learned that the $150,000.00 would not be available as working capital, and he had second thoughts about closing the transaction. The bank talked him into the closing by assuring him that a working capital loan would be made in the spring when work resumed on the company's contracts. The bank officers indicated to Mr. Fischer that it was important to close the transaction on November 11th because the bank was to be audited the next day and the agreement had to be "in the vault". Mr. Fischer indicated that he repeatedly asked for the assistance of counsel at the closing, but was assured by the bank that he did not need counsel because he had always been dealt with fairly in the past by the Bank and would be dealt with fairly on this closing as well. Mr. Fischer reluctantly signed the closing documents and left the bank sometime after 7:00 p.m.

Lorna J. Fischer's testimony about the closing largely corroborates the testimony of John Fischer. She testified that the closing was attended by Kenneth Ayotte, James Halverson (Counsel for ELSB in 1981), John Fischer and herself. She remembered a great deal of conversation about working capital and the renegotiation of working capital loans in the spring. She and John Fischer were "prevented" from leaving the bank and encouraged to close the transaction with promises of fair dealing and future loans. Mrs. Fischer admitted that she was not involved in negotiating the SBA loan and was not an employee, shareholder or officer of the company. Her knowledge of the loan agreement was acquired entirely through discussions with John Fischer.

The testimony of Kenneth Ayotte and James Halverson relative to the closing is much different than that of John and Lorna Fischer. Mr. Halverson testified that he was in fact late for the closing, but that when he arrived, he took Mr. Fischer through the closing documents one by one. He explained to Mr. Fischer that it was Mr. Fischer's discretion either to close or not close the transaction, but that any closing would have to take place on the documents as written. Mr. Halverson indicated that Mr. Fischer did not complain at the closing, or for nearly two years thereafter, about the form or content of the closing documents.

Once the closing documents had been explained, Mr. Ayotte brought in an adding machine tape on which the past due interest on the 1980 loan had been calculated. John Fischer was requested to make payment of the calculated amount. Such payment is customarily required when loans of this nature are closed and Mr. Fischer apparently understood that he would be asked to pay it. However, Mr. Fischer indicated to Mr. Ayotte that he did not have the money. Mr. Ayotte testified that when he learned of this he was "surprised" and doubted whether the transaction could be closed. Mr. Ayotte agreed to close the loan, however, after Mr. Halverson advised him that the past due interest could be recovered from the Red Cedar account at a later date. Mr. Ayotte and Mr. Halverson both deny that anything was said during the closing about the bank's need to get the

agreement "in the vault". Mr. Ayotte testified that, in fact, bank audits are never scheduled in advance but done without warning. He also testified that no audit was done on November 12, 1981. Mr. Ayotte and Mr. Halverson also denied that any promises were made to loan Mr. Fischer additional monies in the spring of 1982. Mr. Halverson indicated that Mr. Fischer said during the closing that he in fact did not need working capital during the winter months. Mr. Fischer was told, then, that the bank would consider a working capital loan in the spring but that no promises could be made. Neither Mr. Ayotte nor Mr. Halverson could remember any request by Mr. Fischer for the assistance of counsel.

Prior to the closing of the SBA loan, Debtor received a bonding commitment from National Bonding Insurance Co. Both debtor and National operated under the assumption that ELSB and SBA would "stand aside" or subordinate their interests in debtor's accounts receivable to the indemnity rights of National. Other than Mr. Fischer's testimony, however, the only evidence that ELSB and SBA had agreed to subordinate their interests in debtor's accounts receivable was a letter written by Kenneth Ayotte to SBA on September 17, 1981. In the letter, Mr. Ayotte said, "Please amend authorization and loan agreement page 2, 3(c)(1) to reflect prior lien of East Lansing State Bank in equipment as opposed to inventory and accounts receivable. This will provide the SBA with a first lien on the inventory and accounts receivable subject of course to bonding company requirements on proceeds of specific contracts." Defendant's Exhibit 5. ELSB failed to supply National with a stand aside agreement however, and, as a consequence, debtor experienced a six week delay in obtaining bonding. The delay effectively shortened the debtor's productive work season. The debtor claims to have been damaged by the shortened season, but no direct testimony was offered on the amount of such damages.

Debtor defaulted on the SBA loan almost immediately after it was made. The first payment under the note was due on December 11, 1981. The first payment on the note was made on January 18, 1982, and no payments were made thereafter. Debtor has remained in default, then, from December 11, 1981, to the present.

Debtor admitted into evidence a letter written to Kenneth Ayotte by Leslie Gierke, Loan Officer, SBA, indicating that the bank may want to consider reducing or deferring debtor's payments. The letter read, "If borrowers working capital shortage will be of short duration, a deferment or reduction in the payment schedule may be in order." Defendant's Exhibit 19. The letter was dated May 24, 1982. ELSB did not defer or reduce the debtor's payment schedule.

During the early spring of 1982, Mr. Fischer again approached ELSB for a working capital loan. The circumstances surrounding the negotiation of this loan are quite confusing and not at all well settled by the evidence before the Court. As best the Court can determine, it appears that in early March of 1982, Mr. Fischer and National approached the bank with a proposal for a $75,000.00 working capital loan. The proposal was that the bonding company issue a guarantee bond to the extent of $40,000.00 of the new $75,000.00 loan. ELSB's counsel, Mr. Halverson, described the proposal in a letter to Mr. Ayotte dated March 25, 1982, as follows:

"In summation, the bonding company is proposing that the bank advance additional funds, a significant portion of which will be at substantial risk. It is further proposed that these funds will be used to allow completion only of three other jobs in progress and the profits therefrom be set over to the bonding company to offset their losses on other projects to date. In essence the bonding company is proposing that the bank not only subordinate its position in the accounts receivable (surplus funds are profits) but that it also bare the costs, the sole benefit of which will be to the bonding company.

"In my considered opinion, the proposal is so entirely preposterous as to be offensive to any one of average intelligence."

Plaintiff's Exhibit No. 6.

Notwithstanding this advise, however, the bank continued negotiating with Mr. Fischer and National. On May 10, 1982, Mr. Halverson wrote to debtor's counsel, Mr. Sydney L. Frank, informing him of the terms and conditions of a $75,000.00 loan agreement to which the bank would willingly agree. For some reason that is not clear from the record, this agreement was never finalized by the parties.[2]

On June 15, 1982, ELSB wrote to SBA and requested that SBA purchase its guarantee portion of the $550,000.00 loan. SBA purchased its guarantee portion of the loan for $451,000.00 on or about June 12, 1982. Thereafter, ELSB took steps to enforce the unpaid portions of the Red Cedar loans. Funds were set off from Red Cedar's accounts with ELSB, and by letter dated October 19, 1982, ELSB requested that the Department of Transportation, State of Michigan, pay future contract sums due and owing to Red Cedar directly to ELSB. The attempt by ELSB to be paid directly by the State of Michigan resulted in litigation between ELSB and National. National eventually prevailed in this litigation and received the sums it was due and owing under the Red Cedar contracts from the State of Michigan.

This case was tried without a jury. As a finder of fact, the Court is impressed from its observation of the testimony taken at trial that none of the witnesses were intentionally deceptive or evasive. All of the witnesses appeared highly credible, and they each testified from what the Court concludes was their honest recollection of the relevant facts. However, the Court finds that certain beliefs and impressions testified to at trial were not reasonable in light of the facts upon which there is agreement. In the opinion which follows, the Court's conclusions of fact, and its resolutions of the various factual disputes, will be set forth as they become relevant.

## LAW

In the several complaints and answers which comprise this consolidated adversary proceeding, several causes of action were pleaded by the Debtor and the Fischers against ELSB. Many of the actions are duplicative, and on several others no proofs were submitted at the time of trial. Those actions which went unproven are, of course, denied for that reason.[3] The actions which have been genuinely disputed will be summarized by the Court and addressed *seriatim*.

## I

The principal complaint of Red Cedar and the Fischers is that ELSB had an enforceable commitment to make a supplemental unrestricted loan of $150,000.00 to Red Cedar in November of 1981, and ELSB's failure to make such a loan was a breach of its duty to deal with its customer in good faith. Red Cedar and the Fischers rely almost entirely on the recent decision of *K.M.C. Co., Inc. v. Irving Trust Co.,* 757 F.2d 752 (*6th* Cir.1985). They cite *K.M.C.* for the proposition that general principles of commercial fairness would have re-

---

**2.** It would appear that the Bank simply changed its mind. Mr. Sidney L. Frank (who acted as legal counsel for Mr. Fischer and for National during this period) testified that he expected documentation from ELSB to close this loan, but that such documentation never reached his office. About three weeks after it was supposed to have arrived, he called Mr. Halverson and was informed that the loan would not be made. Trial transcript at page 14–15

**3.** The actions which are denied for simple lack of proof are:

A. Any action or claim having to do with ELSB's foreclosure by advertisement on the Fischer's residence.

B. Any action having to do with ELSB's attempt to collect rental payments from Red Cedar relative to the real properties upon which ELSB had foreclosed.

C. Any action alleging that ELSB violated the Federal Truth in Lending Act by failing to give Red Cedar or the Fischers a period of reconsideration after the closing of the 1981 loan.

quired ELSB to make the loan to Red Cedar. For the reasons expressed below, however, the Court finds that *K.M.C.* does not stand for the rule advocated by Red Cedar, and does not support Red Cedar's cause.

In *K.M.C.*, the Court held that a bank which had entered into a loan commitment with its customer, held a good faith obligation to give prior notice to its customer, before the time when the loan was to be made, that it was revoking its commitment. The Bank in *K.M.C.* issued a line of credit to K.M.C. in the amount of $3,500,000.00. Monies loaned pursuant to the line of credit were payable upon demand. To provide the bank with security, K.M.C. agreed to the extraordinary procedure of having all its receivables deposited into a bank account over which Irving Trust (the lender) had exclusive control (the so called "blocked account" method of securing payment). Prior to March 1, 1982, K.M.C. had made draws on the line of credit in the amount of approximately $2,700,000.00. During the same period of time these draws were being made, K.M.C. became seriously financially troubled, sustaining "heavy losses" in 1981, acquiring substantial uncollectible receivables in excess of bad debt reserve, and becoming "heavily leveraged". *K.M.C.* at 766. When the last draw of $800,000.00 on the line of credit was presented to Irving Trust on March 1, 1982, it was refused. For the refusal, a jury returned a verdict against Irving Trust in the amount of $7,500,000.00 plus interest. The Court of Appeals affirmed the award.[4]

The *K.M.C.* decision winds its way through several sections of the Uniform Commercial Code ("U.C.C.") and several court decisions dealing with the question of lender liability. The court begins its analysis by asserting that Irving's "obligation to act in good faith would require a period of notice to K.M.C. to allow a reasonable opportunity to seek alternate financing, absent valid business reason precluding Irving from doing so". *K.M.C.* at 759. In support of its notice rule, the court cites the 1891 decision of *Wills v. Alexandre*, 130 N.Y. 642, 29 N.E. 142 (1891), and a comment from the U.C.C. article dealing with sales of goods (Section 2–309, official comment 8). From there, the court proceeds directly to the issue, not of Irving's obligation to give K.M.C. notice, but of the enforceability of Irving's obligation to make the underlying advance of funds. And here, too, the court recognizes a good faith limitation on the bank's discretion not to make the additional loan. The court does not cite any authority for its position in this section of the opinion. See, *K.M.C.*, at page 759–760. Turning next to the question of Irving's discretion to demand payment of the funds already advanced, the court observes that "the Uniform Commercial Code and the courts have imposed limitations of reasonableness and fairness". *K.M.C.* at 760. The court cites U.C.C. § 1–208 and *Brown v. A.V.E.M.C.O. Investment Corp.*, 603 F.2d 1367 (9th Cir. 1979). What U.C.C. Section 1–208 in fact says is that a lender may accelerate an "at will" loan agreement only if the lender in good faith believes that the prospect of payment or performance is impaired.[5] Re-

---

**4.** At first blush, it might appear that the *K.M.C.* decision does not apply in this case. *K.M.C.* involved the failure of a lender to make a loan, but ELSB agreed to make a loan of $150,000.00 and did make a loan of $150,000.00. Red Cedar's objection to the manner of distribution should be viewed, according to ELSB, as a simple breach of contract objection. This would require Red Cedar to prove the existence of the contract provision upon which it relies, which, ELSB argues, it can not.

It is Red Cedar's position, however, that for all practical purposes, ELSB should be understood as not having made the loan since (1) there was

a mere substitution of one loan for another (no new or additional credit) and (2) the 1981 loan matured on approximately the same date as the loan it replaced. For the reason that Red Cedar also alleges that ELSB failed to make a loan in the spring of 1982, and since, as a consequence, the Court must address the issue anyway, the Court will not reject Red Cedar's position.

**5.** U.C.C. § 1–208 provides:

"A term providing that one party or his successor in interest may accelerate payment or performance or require collateral or additional collateral "at will" or "when he deems himself insecure" or in words of similar import shall be

lying on § 1–208, the court in *Brown* held that it was reversible error for the trial court to instruct the jury that there could be an automatic enforcement of an accelerate clause if the jury merely found a technical breach of the loan agreement. *Brown*, at 1376. The *Brown* Court rejected the argument that Section 1–208 did not apply in the event of default, and held that any acceleration must be accompanied by a reasonable fear of nonpayment or nonperformance.

The issue before the court in *K.M.C.*, however, was not whether the lender had wrongfully accelerated the existing loan, but whether the lender had wrongfully refused to extend additional credit. Even though the *K.M.C.* Court never expressly so indicated, it is clear from several sections of the opinion that the court was adopting the rule in Section 1–208 and the rationale in *Brown* for application in the area of future advances. On page 761 of the opinion, the court cites *Van Horn v. Van De Wol, Inc.*, 6 Wash.App. 959, 497 P.2d 252 (1972), for the proposition that "the criterion for permissible acceleration ... has the dual elements of (1) whether a reasonable man would have accelerated the debt under the circumstances, and (2) whether the creditor acted in good faith". *K.M.C.* at 761. In the very next sentence the court says, "There is ample evidence in the record to support a jury finding that no reasonable loan officer in the same situation would have refused *to advance funds* to K.M.C. without notice ..." *Id.* (emphasis added). Further down the page the court says, "... if Sarokin [(the loan officer of Irving Trust)] believed that Irving was adequately secured he would not have been acting in accordance with that duty of good faith to have refused without notice *to advance funds* to K.M.C." *Id.* (emphasis added). And on page 762 the court says, "on this basis alone [(lack of finan-

cial crisis)], the jury could have found that Irving did not fulfill its obligation of good faith performance to K.M.C. when it cut off financing without prior notice." *Id.* at 762. These sections of the opinion (and other sections) make it clear that the court was applying the rule set forth in Section 1–208 in the area of future advances.

However, that is not the basis upon which the court found Irving liable to K.M.C. As indicated above, the court does not find Irving liable for failing to make the loan, but, rather, for failing to give K.M.C. adequate *notice* that the loan would not be made. The court repeatedly highlights Irving's failure to give notice, and at one point even says, "If Irving had given K.M.C. 30 days, 7 days, even 48 hours notice, we would be facing a different situation. However, no notice was given." *K.M.C.* at 763. Thus, the court's decision rests not so much on the failure of Irving to make the loan, or upon any bad faith that might be attributable to Irving in that regard, but upon the bad faith evidenced by Irving's failure to give K.M.C. notice.

The existence of an agreement to make a loan, however, is a necessary precondition for imposition of the *K.M.C.* notice rule. This Court recognizes that the *K.M.C.* Court did not rely on any single express contractual provision, or the breach of any such provision, to find Irving liable to K.M.C. The notice requirement was implied by the Court. However, there must be some enforceable agreement between the parties to give rise to the notice rule. A mere revokable loan agreement, such as a revokable letter of credit, certainly would not require application of the rule. U.C.C. § 5–106(3).[6] There must be an agreement which is enforceable when made, or, as in the case of *K.M.C.*, an agreement which is enforceable upon the occurrence of some condition precedent (such as inventory and accounts receivable

construed to mean that he shall have power to do so only if he in good faith believes that the prospect of payment or performance is impaired. The burden of establishing lack of good faith is on the party against whom the power has been exercised."

Mich.Comp.Laws § 440.1208 (1962) (Mich.Stat. Ann. § 19.1208 (Callaghan 1981)).

**6.** Mich.Comp.Laws § 440.5106(3) (1961) (Mich. Stat.Ann. § 19.5106(3) (Callaghan 1981)).

volume). Without an agreement, or with a merely illusory one, there is no legal basis upon which one would predicate a notice duty.[7]

■ Even with an agreement, however, it is evident that under the rationale in *K.M.C.*, the notice rule would not apply if the lender had reason to believe that the borrower would not be capable of payment or performance, or if the borrower otherwise falls outside the lender's eligibility guidelines.[8] A notice requirement which is intended to give the borrower sufficient time to secure alternate financing would be meaningless for a borrower who could not demonstrate objective credit worthiness. No amount of notice would suffice for such a borrower, and the lender, if required to give notice, would be in the untenable position of not being able to give the borrower enough. *K.M.C.* does not require this re-

sult, but simply provides that one relying on even a conditional loan commitment, who by objective measure otherwise qualifies for the loan, should be given a meaningful opportunity to secure alternate financing if the commitment is going to be refused. This rule is justifiable for the reason that one might very well place detrimental reliance upon a loan commitment if one remains within the eligibility qualifications of the lender. Also, without the rule, lenders might be able to refuse financing at the last minute in an attempt to secure concessions from its customers more favorable to the lender.

■ Application of the *K.M.C.* holding in the case at bar shows that ELSB did not breach any duty of good faith it might have owed to Red Cedar. ELSB did not fail to give notice to Red Cedar, prior to the date the loan in issue was closed, that it would

---

**7.** This Court recognizes that the *K.M.C.* Opinion is somewhat confusing on this point. In one respect, it might appear that the financing involved in that case was purely revocable at will since it was payable upon demand and since the lender was not found to have breached any specific contractual provision. The Court, of course, never indicated whether the financing was revocable or not. The Court, however, rejected the creditor's argument that the demand provisions of the loan agreement rendered it revocable in nature. See, *K.M.C.* at 760. The obvious implication is that the agreement contained no other language which would have shown it to be revocable. We would find, then, that the loan in *K.M.C.* was not revocable but was enforceable if the debtor remained within the limits of the lender's eligibility formula. Accord, W. Warren, *Good Faith Under the Uniform Commercial Code* (Emerging Theories of Lender Liability, at 54 (ABA 1985)).

That the Court's rule only applies to irrevocable loan commitments is evident from the official comment accompanying U.C.C. § 1–208, the section upon which the Court principally relies. Section 1–208, official comment, paragraph 2, says:

"Obviously this section has no application to demand instruments or obligations whose very nature permits call at any time with or without reason. This section applies only to an agreement or to paper which in the first instance is payable at a future date."

An obligation "whose very nature permits call at any time with or without reason" is a revocable obligation, and the Court's ruling would clearly not apply to such obligations. A holding by this

Court that the Court of Appeals in *K.M.C.* intended to include within the scope of its notice rule obligations "whose very nature permits call at any time with or without reason" might seriously limit the availability of "at will" financing, without which many of the most troubled (and needy) commercial entities would be unable to obtain credit. We would not read that unnecessary result into the *K.M.C.* decision, and we would not create a rule on our own which would produce such a result.

**8.** That the *K.M.C.* Court did not intend to apply the notice rule where the debtor has an impaired ability to pay or perform is evident for the following reasons:

(A) The Court relied on U.C.C. § 1–208, and § 1–208 expressly provides that a creditor may in good faith demand payment if he believes the ability of the debtor to pay or perform is impaired. See, note #5 *supra*.

(B) The Court specifically held that the notice rule only applied "absent valid business reason precluding" its application. *Supra* at 236. An inability to collect the debt is a "valid business reason".

(C) The Court took great care to point out that there was competent evidence upon which the jury could have found that the debtor was able to make regular and continued payments, and that the creditor believed the debtor was able to make such payments. Thus, as a factual matter, the Court found that, because K.M.C. did not have an impaired ability to pay or perform, there was no "valid business reason precluding" the necessity of notice. *K.M.C.*, at 760–763.

not make an unrestricted loan of $150,-000.00. Mr. Ayotte testified that he repeatedly tried to explain to Mr. Fischer that the $150,000.00 portion of the loan would not be attributable to future operating expenses, and that as a matter of principle, working capital, or at least some portion of it, had to be generated internally by the company. Mr. Fischer denied that those explanations were made to him. The court, however, finds Mr. Ayotte's testimony more plausible. His testimony is consistent with ELSB's manner of past dealing with Mr. Fischer.[9] Also, the Court is persuaded by the fact that ELSB has not denied that Mr. Fischer may have hoped to receive the $150,000.00 to pay future operating expenses, but has explained that they did everything reasonable within their power to help Mr. Fischer understand that such a hope was not realistic. The record would indicate that Mr. Fischer was either somewhat stubborn on this issue, or simply could not understand it. At any rate, the Court holds that ELSB discharged any notice obligation it had to Red Cedar.

■ Moreover, the facts in this case make it clear that Red Cedar was in serious financial condition on November 11, 1981, and, therefore, under the rule articulated in *K.M.C.*, ELSB's duty to notify Red Cedar of its intention not to make a $150,000.00 working capital loan did not even arise. Red Cedar's debt/equity ratio was growing worse in 1981, it was in partial default on its existing loans to ELSB, and it was experiencing serious cash flow problems. Certainly the future prospect of payment or performance was impaired and certainly the loan officers at ELSB were aware of this. Therefore, even if it had failed to do so, ELSB was under no obligation to give Red Cedar notice.

■ On the question of ELSB's commitment to make the loan, the Court would note that there is a significant factual distinction between this case and *K.M.C.* In *K.M.C.*, there was no doubt that Irving had

issued a line of credit to K.M.C. Irving had in fact committed to make a loan, however conditional that commitment may have been. In the case *sub judice*, however, there is no clear evidence that ELSB ever committed to the loan sued upon. To prove the existence of a commitment, Mr. Fischer offered the letter written by Mr. Ayotte to Mr. Yovan,[10] and his own testimony concerning oral representations made to him by ELSB. ELSB has denied the oral representations and offers the past practice of the parties and the loan documents in support of its position that no loan commitment had been made. The court can find nothing on the face of the loan documents which would indicate how the $150,000.00 was to be distributed. But given the fact that a restructuring loan of only $700,000.00 was contemplated by the parties, together with the other facts indicated above, the Court would find that the evidence preponderates in favor of ELSB on this point. The Court would find, then, that ELSB had not committed itself to an unrestricted loan of $150,000.00. On this basis, *K.M.C.* is clearly distinguishable, since the duties imposed on the bank in that case would not have been imposed in the absence of a loan commitment. Cf., *National Farmers Organization v. Kinsley Bank*, 731 F.2d 1464 (10*th* Cir.1984); see, also, page 237 *supra*. Red Cedar has encouraged the Court to read *K.M.C.* much more broadly and in such a way that a good faith duty to make a loan could be predicated on the mere fact that ELSB had always made loans available to Red Cedar in the past. Red Cedar is essentially arguing that under *K.M.C.*, no loan commitment or agreement need exist to give rise to a duty to extend new credit. For the reasons set forth at length above, this Court does not believe that *K.M.C.* can or should be read so broadly, and would not on its own adopt such a rule.

■ Even if Red Cedar had been able to prove liability, however, no convincing evidence was submitted at the time of trial

---

**9.** The 1980 restructuring loan required complete repayment of the prior loan.

**10.** See page 234 *supra*.

proving damages. Red Cedar has prayed for over $1,000,000.00 in its complaint, but has not shown how the failure of ELSB to loan an additional $150,000.00 precipitated such damages. After all, had the $150,-000.00 not been attributed to past debt (which was in arrears and due by the terms of the 1980 agreement on March 1, 1982), ELSB would have had the right to call such debt. This would have placed a corresponding drain on Red Cedar's working capital and the company would have ended up in the spring of 1982 in exactly the same financial situation it now complains of. Also, the loan that Red Cedar received inured to the company's benefit at least insofar as it cured the defaults which existed under the 1980 loan agreements. The only damages which might have been suffered by Red Cedar would have been caused by the delay the company experienced in obtaining bonding. But this delay was only temporary, and by Red Cedar's own admission was caused more by the failure of ELSB to sign a "stand aside" agreement than by the failure of ELSB to make the desired loan. In short, Red Cedar provided no convincing proof that any delay in bonding that might have been occasioned by the failure of ELSB to make the desired loan caused the company serious damage and certainly not $1,000,000.00 damage.

## II

■ Red Cedar's second cause of action is based on ELSB's failure to make a loan to Red Cedar in the spring of 1982. Red Cedar alleges that during the closing of the SBA loan on November 11, 1981, Mr. Ayotte told John Fischer that ELSB would make a working capital loan to Red Cedar in the spring of 1982 when the company resumed work on its construction projects. See, *supra*, at 233. It was ELSB's promise to make this loan that allegedly persuaded Mr. Fischer to close the SBA loan. When Mr. Fischer approached the Bank in

the spring of 1982, he was refused financing. See, *supra*, at 234–235.

Mr. Ayotte and Mr. Halverson testified that a discussion was had during the closing of the SBA loan regarding a working capital loan in the spring of 1982, but that the Bank only agreed to consider such a loan. See, *supra* at 234. The Bank did not "promise" to make the loan.

The Court finds that Red Cedar's proofs fall short of proving the existence of a loan commitment.[11] At best, the Bank agreed to consider an application for a working capital loan in the spring. Such an agreement does not satisfy the requirement of *K.M.C.* that there be an irrevokable agreement between the parties before a lender can be found liable for failure to act in good faith with its customer. For all of the reasons stated in section one of this Opinion, this cause of action is denied.

## III

■ Red Cedar alleges that ELSB breached its contract with Red Cedar when it failed to issue a "stand aside" agreement to National. The failure of ELSB to issue such an agreement caused National to delay its bonding of Red Cedar for over six (6) weeks. This delay shortened Red Cedar's productive work season and caused Red Cedar allegedly substantial damages. ELSB has denied that it committed to issue a "stand aside" agreement. It is ELSB's position that Red Cedar has failed to meet its burden of proof on this issue.

To prove the existence of ELSB's commitment to issue the "stand aside" agreement, Red Cedar offered the testimony of John Fischer that he believed ELSB had agreed to issue such a commitment, and a letter written by Mr. Ayotte to Mr. Yovan at the SBA office. In the letter, Mr. Ayotte indicated that ELSB's security interest attached to Red Cedar's equipment rather than Red Cedar's inventory and accounts

---

11. A possible objection based on the parol evidence rule to the testimony about oral commitments was not made at the time of trial. Therefore, Red Cedar's testimony about oral represen-

tations was received. The Court finds, however, that the evidence received does not preponderate in Red Cedar's favor on this point. See, *Stewart v. Ashley,* 34 Mich. 183 (1876).

receivable. The letter further indicated that SBA would have a first lien on Red Cedar's inventory and accounts receivable, subject to "bonding company requirements on proceeds of specific contracts". See, *supra* at 234.

This letter fails to prove that for which it is offered. The letter does not in any way indicate ELSB's intention to subordinate its liens to the interests of National. It simply indicates that, at least at the time the letter was written, ELSB had no claim against Red Cedar's accounts receivable. If the letter shows anything about subordination, it shows that Mr. Ayotte expected *SBA* to subordinate *its* liens on Red Cedar's accounts receivable. But it does not indicate anything about the subordination of the interests of ELSB.

The only evidence before the Court, then, supporting Red Cedar's allegations on the subordination issue is the testimony of John Fischer. That evidence alone does not satisfy Red Cedar's burden of proving its cause by a preponderance of the evidence. ELSB has, through the testimony of Mr. Ayotte and Mr. Halverson, denied that it agreed to any form of subordination. From its observations at the time of trial, the Court would find the testimony offered by ELSB more credible on this point. But even if the testimony of each party were equally credible, the evidence as a whole would be at best about equal on the subordination issue. And in that event, Red Cedar has still failed to prove its case. See, 11 Michigan Law & Practice, EVIDENCE § 21 (Citing *In Re Miller's Estate*, 300 Mich. 703, 2 N.W.2d 888 (1942); *Michigan Aero Club v. Shelley*, 283 Mich. 401, 278 N.W. 121 (1938)).

■ Even if the letter written by Mr. Ayotte did indicate ELSB's intention to subordinate its liens on Red Cedar's property, Red Cedar's proofs would still have fallen short of establishing the existence of an enforceable contract for subordination. All that such a letter would show is that Mr. Ayotte, at some time prior to the closing of the SBA loan, was contemplating subordinating ELSB's liens to the interests

of National. That does not mean that he ever entered into a contract to that effect. Indeed, parties often engage in lengthy negotiations prior to signing a contract constituting a final integration of their intentions, and during negotiations, terms and conditions are often proposed that are not incorporated into the final agreement. It is for this reason that evidence of prior written or oral agreements is objectionable. See, e.g., *National Cash Register Co. v. Hosier*, 251 Mich. 402, 232 N.W. 177 (1930). See, also, Mich.Comp.Laws § 440.2202 (1961) (Mich.Stat.Ann. § 19.2202 (Callaghan 1981)). And it is also for this reason that the Court finds Red Cedar's proofs insufficient on the question of subordination. This cause of action, then, is denied.

IV

■ Relying on a letter written to ELSB by SBA in May of 1982, Red Cedar asserts that ELSB acted in bad faith when it failed to defer or reduce Red Cedar's payment schedule. The letter read, "If borrower's working capital shortage will be of short duration, a deferment or reduction in payment schedule may be in order." See, *supra* at 234. For several reasons, the Court would find that good faith did not require the result advocated by Red Cedar.

First, Red Cedar was already five months in default on the date the SBA letter was written. Second, ELSB was aware of sufficient facts to predicate a belief that Red Cedar's working capital shortage would not be "of short duration". Third, by using the word "may", SBA was clearly indicating that ELSB's decision on deferment was purely discretionary. Also, there is no evidence whatsoever in the record that ELSB agreed to provide Red Cedar with a deferred payment plan. For all of these reasons, this cause of action is denied.

V

■ Red Cedar asserts that ELSB was its fiduciary, and that by failing to make an unrestricted loan of $150,000.00 and failing

to issue the "stand aside" agreement, ELSB breached its fiduciary duty to Red Cedar. Red Cedar relies principally on the case of *Smith v. Saginaw Savings & Loan Association*, 94 Mich.App. 263, 288 N.W.2d 613 (1979). It cites *Smith* for the proposition that "a fiduciary relationship exists when there is a reposing of faith, confidence and trust and the placing of reliance by one upon the judgment and advice of another." Defendant's Trial Brief at, 11. Since faith, confidence and trust were reposed in ELSB by Red Cedar, Red Cedar asserts that the *Smith* case compels a finding that ELSB was Red Cedar's fiduciary. The Court, however, can not agree.

While it is true that the language quoted above can be found in the *Smith* decision (*Smith, supra,* at 274, 288 N.W.2d 613), the following language can also be found there:

> "[T]here is little doubt that a fiduciary relationship between the Smiths and Saginaw ... was established and a breach thereof occurred. *This relationship was not the general one existing between a bank and its depositors but was one of trust and confidence predicated on the unique facts of this case.*

*Id.* (emphasis added). *Smith* involved the very unique situation in which a loan officer at the bank agreed not only to loan money to the plaintiffs for the construction of their home, but further agreed to make sure that the construction was completed without cost overruns and that no money would be released to the prime contractor until work was actually completed. The loan officer also approved of the builder, the building contract and the building specifications. *Id.* at 275, 288 N.W.2d 613. He did this notwithstanding that he knew the builder was in financial trouble. He also knew that the plaintiffs were sickly and lived 250 miles from the building site. Under these circumstances, the Court found that a fiduciary relationship existed and that when the loan officer allowed construction to fall behind progress payments, the fiduciary duty was breached. The facts in the case at bar are in no way comparable to those in *Smith*. No prom-

ises were made by ELSB to supervise Red Cedar's business or to insure that Red Cedar always had sufficient operating capital to remain in business. ELSB never made any representations upon which Red Cedar could reasonably have relied that it would make an unrestricted loan of $150,000.00 in November of 1981, that it would issue a "stand aside" agreement, or that it would make a working capital loan in the spring of 1982. It is true that Mr. Fischer may, as he testified, have relied on what he perceived to be ELSB's commitment to loan him an additional $150,000.00 and to issue a "stand aside" agreement to National. But any such reliance on his part was not reasonable, and this cause of action is, therefore, denied. CF: *In Re Jennings' Estate*, 335 Mich. 241, 55 N.W.2d 812 (1952); *In Re Cattrell's Estate*, 235 Mich. 627, 209 N.W. 842 (1926).

## VI

■ Red Cedar alleges that ELSB's failure to provide a "stand aside" agreement to National and its attempt to collect contract funds directly from the State of Michigan, constituted intentional interference with Red Cedar's contractual relations with National. In Michigan, the elements of tortious interference with contractual relations include (1) the existence of a valid contract, (2) breach of the contract, (3) inducement of the breach by the "interferer" and (4) no justification for the inducement. *Derosia v. Austin*, 115 Mich.App. 647, 653–654, 321 N.W.2d 760 (1982); *Northern Plumbing & Heating, Inc., v. Henderson Brothers, Inc.*, 83 Mich.App. 84, 92, 268 N.W.2d 296 (1978); *Dassance v. Nienhuis*, 57 Mich.App. 422, 225 N.W.2d 789 (1975). In *Dassance, supra,* at 432–433, 225 N.W.2d 789, the Court observed:

> "In *Meyering v. Russell*, 53 Mich App 695, 704–705; 220 NW2d 121 (1974), this Court examined the modern law of interference with a contract and stated:
>
> > " 'Appellants concede that damages may be awarded where a tortious interference with another's contractual rights occurs, but assert that the rule

requires the intentional doing of a wrongful act or other conduct indicating malice. Early cases did hold that malice was a prerequisite to liability but, as the law evolved, malice became less and less important. *Today, liability may be found if the interference is by inducement or is purposeful interference.* See 4 Restatement Torts, § 766, pp. 49–63.

" ' "Except as stated in Section 698, *one who, without a privilege to do so, induces or otherwise purposely causes a third person not to (a) perform a contract with another,* or (b) enter into or continue a business relation with another, is liable to the other for the harm caused thereby."

" ' " * * * d. Induces or otherwise purposely causes. The word "induces" refers to the situations in which A causes B to choose one course of conduct rather than another. Whether A causes the choice by persuasion or by intimidation, B is free to choose the other course if he is willing to suffer the consequences."

" ' "h. Inducement by offer of better terms. Another method of inducing B to sever his business relations with C is to offer B a better bargain than that which he has with C." ' 4 Restatement Torts, § 766, pp 49, 54–55, 58.

"It is clear that under this standard, malice or wrongful intent is not a prerequisite to liability. All that is required is a defendant's knowledge of the contract and his *unauthorized interference with it.* By persuading Nienhuis to sell the land to Emmons and not to plaintiffs, knowing all the time that plaintiffs had a prior contract with Nienhuis, defendant Bennett "induced" Nienhuis to breach his contract with plaintiffs, and under *Meyering* and the Restatement, this constituted tortious interference with plaintiffs' contract. Therefore, the trial court's finding that defendant Bennett

tortiously interfered with plaintiffs' contract was proper."

(emphasis added). With these comments in mind, this Court could not find that ELSB interfered with any contractual relationship existing between Red Cedar and National. ELSB did not "induce", as that term in defined in *Dassance,* any breach of Red Cedar's contract with National. ELSB acted within its rights when it refused to issue the "stand aside" agreement and when it sought to enforce its security agreements in State Court. These actions may have caused National to forestall issuing a bond to Red Cedar, but there is no indication in the record that ELSB intended this result. Also, ELSB was clearly justified in taking the action it did. For these reasons, this cause of action is denied.

Michigan also recognizes the tort of interference with advantageous business relations. *Wilkerson v. Carlo,* 101 Mich. App. 629, 631–632, 300 N.W.2d 658 (1980) (citing *Northern Plumbing & Heating, Inc. supra*). As stated in *Wilkerson:*

"The elements of tortious interference with economic relations are: (1) the existence of a valid business relationship or expectancy, (2) knowledge of the relationship or expectancy on the part of the interferer, (3) an intentional interference causing a breach or termination of the relationship or expectancy, and (4) resulting damage to the party whose relationship or expectancy has been disrupted."

For the previously discussed reason that ELSB did not "intend" a "breach or termination of the relationship or expectancy" of Red Cedar and National (if any), this cause of action is also denied.

The parties have stipulated that if Red Cedar's claims and counter-claims were rejected by the Court, ELSB's liens would be fully enforceable. Because of that stipulation, however, insufficient proofs were submitted at trial regarding the amount of ELSB's liens. Therefore, the Court will leave it to ELSB to draft an order, which will be subject to Red Cedar's approval, for submission to the Court.[12] If the parties

---

12. The parties have consented to the Bankruptcy Court's jurisdiction pursuant to 28 U.S.C. § 157(c)(2).

can not agree on the form or content of the Order, a hearing will be set for the taking of further proofs.