FIRST NATIONAL BANK AND TRUST
COMPANY OF WILLISTON, Plaintiff
and Appellee,

v.

Dorothy A. BRAKKEN, Defendant
and Appellant.

Civ. Nos. 900186, 900187.

Supreme Court of North Dakota.

April 18, 1991.

John H. MacMaster of MacMaster & Bonner, Williston, for plaintiff and appellee.

Janet Holter Zander of Anseth & Zander, Williston, for defendant and appellant.

VANDE WALLE, Justice.

In this consolidated appeal, Dorothy Brakken seeks reversal of two district court foreclosure judgments granted in favor of the First National Bank and Trust Co. of Williston [Bank]. We affirm.

In 1982 Dorothy's son, Rodney Brakken, and Ron Ackerson entered into a partnership and opened Square Deal Guns and Ammo [Square Deal] in Williston. The partners entered into a contract for deed to purchase the Sunset Motel to house their business. The Bank loaned the partnership funds which were used for a down payment on the property and for the purchase of inventory and fixtures. The partners decided to remodel the motel into rental office space for the part that was not needed for Square Deal and to rename the property Sunset Mall. Rodney and Ron entered into a series of short-term loans with the Bank to finance the remodeling project with the understanding that, upon completion of the project, they would apply to the Small Business Administration [SBA] for long-term financing of the entire debt. Some of these promissory notes were unsecured and others were secured with business assets.

The SBA denied the application for financing in May 1985. At that point, Square Deal was losing money, some of the notes were past due, and the Bank was demanding payment to reduce the outstanding balances due on the loans. At Rodney's request, Dorothy borrowed $42,-000 from the Bank in June 1985 and turned the money over to Rodney and Ron for their business venture and for Rodney's personal use. The loan proceeds were deposited in the Sunset Mall account, the Square Deal account, and Rodney's personal account. The promissory note executed by Dorothy indicates that the loan was due in one year and was not secured. Rodney testified that the partnership needed the money to finish the mall project and that Dorothy agreed to help. According to Rodney, the partnership planned to pay the money back to Dorothy and a promissory note was prepared evidencing the loan from Dorothy to Square Deal. However, this note was not signed.

The Bank became concerned with the number of short-term single-payment business loans that were outstanding. Federal bank examiners had placed the loans on a "criticized" list and the Bank had internally classified them in a similar manner. The Bank wanted to extend the loans and place them on a monthly payment schedule. The Bank asked for either additional security or reductions on the loans. Rodney and Ron subsequently sold Square Deal for $25,000 and applied the sale proceeds to reduce the

amount of the loans. In addition, Rodney suggested that he would visit with his mother about using some real estate she owned to secure the loans.

In March 1986 the business loans were consolidated and Rodney, his wife, Ron, and Dorothy signed a promissory note for $83,466.38 payable in 36 monthly installments. Dorothy signed a real estate mortgage covering her farm property as security for the loan. Rodney and Ron subsequently sold the Sunset Mall and received a net total of $8,785.18 after paying off the contract for deed, real estate taxes, and other settlement charges. This money was placed into a savings account under Dorothy's name at the Bank. Dorothy authorized automatic transfers of $1,100 per month from the account to be applied toward the consolidated business loan.

During this time, Rodney was also having personal financial difficulties. Rodney had fallen behind on payment of numerous personal loans he had received from the Bank. Some of these were secured and others were not. The Bank requested additional security for the loans. Rodney again asked Dorothy to help him by mortgaging a house she owned in Williston as security for the personal loans. In April 1986 Rodney's personal loans were consolidated and refinanced. Dorothy signed a promissory note for $34,464.87 and a real estate mortgage on the house to secure the debt. Rodney testified that he intended to pay off this debt to the Bank.

In September 1987 Rodney filed for bankruptcy and in January 1988 Ron filed for bankruptcy. Dorothy was listed as a creditor in each proceeding. Their debts to Dorothy were ultimately discharged by the bankruptcy court

Dorothy defaulted on the two promissory notes and the Bank sued to foreclose the mortgages on the farm property and the house. Dorothy filed an answer and counterclaim in both actions asserting failure of consideration and fraud on the part of the Bank. Dorothy asked the court to "direct the satisfaction of all mortgages" and award her monetary damages because the Bank's actions caused her "undue hardship,

embarrassment, mental anguish and mental stress." She also sought jury trials on all issues.

Prior to trial, the trial court granted the Bank's motions to strike Dorothy's demands for jury trials. The cases were tried together before the court without a jury. The trial court found that the Bank had not committed fraud and that there was sufficient consideration for the mortgages. Judgments of foreclosure were entered and Dorothy appealed.

■ Dorothy asserts that the trial court erred in striking her demands for a jury trial on her counterclaims. The trial court concluded that the counterclaims were legal defenses which did "not serve to transform this suit in equity into an action at law." We agree with the trial court.

■ Whether a party is entitled to a jury trial depends upon whether the case is an action at law or an action in equity. *Dakota Bank & Trust v. Federal Land Bank,* 437 N.W.2d 841 (N.D.1989). An action at law for the recovery of money only is triable to a jury as a matter of right. *General Electric Credit Corp. v. Richman,* 338 N.W.2d 814 (N.D.1983). In an equitable action, there is no absolute right to a jury trial. *Northwestern Bell Tel. Co. v. Cowger,* 303 N.W.2d 791 (N.D.1981); *C.I.T. Corporation v. Hetland,* 143 N.W.2d 94 (N.D.1966). The foreclosure of a mortgage is an equitable proceeding. *Midwest Fed. S & L Ass'n of Minot v. Kouba,* 335 N.W.2d 780 (N.D.1983).

■ Although a party who raises legal issues in a counterclaim to an equitable action is entitled to a jury trial on those issues [*Ask, Inc. v. Wegerle,* 286 N.W.2d 290 (N.D.1979); *Landers v. Goetz,* 264 N.W.2d 459 (N.D.1978) ], a party who raises legal defenses denominated as a counterclaim in an equitable action is not entitled to have a jury trial on those defenses. *Great Plains Supply Co. v. Erickson,* 398 N.W.2d 732 (N.D.1986). Furthermore, while money damages traditionally constitute a claim for legal relief triable to a jury [*Moses v. Burleigh County,* 438 N.W.2d 186 (N.D.1989) ], where the damage claim

is incidental to and dependent upon a primary claim for which a jury trial is not allowed, the parties are not entitled to a jury trial as to the damage claim. *Kopperud v. Reilly*, 453 N.W.2d 598 (N.D.1990); *General Electric Credit Corp. v. Richman, supra; Lithun v. Grand Forks Pub. School Dist. No. 1*, 307 N.W.2d 545 (N.D. 1981).

In this case, Dorothy's counterclaims essentially alleged that there was a failure of consideration for the notes and mortgages, that the Bank fraudulently induced her into entering into the notes and mortgages, and that "because of [the Bank's] actions" she has suffered "undue hardship, embarrassment, mental anguish and mental stress" entitling her to "satisfaction of all mortgages," $150,000 in compensatory damages, and an unspecified amount of punitive damages. The allegations of failure of consideration and fraudulent inducement, if proven, would negate the existence of otherwise valid notes and mortgages. These allegations are affirmative defenses which controvert the allegations in the Bank's complaint. We do not believe that they present independent causes of action. *See Great Plains Supply Co. v. Erickson, supra; C.I.T. Corporation v. Hetland, supra; Zeman v. Mikolasek*, 75 N.D. 41, 25 N.W.2d 272 (1946). The claims for damages are reliant upon and incidental to Dorothy's affirmative defenses to the foreclosure actions. *See Kopperud v. Reilly, supra.* Under these circumstances, we conclude that the trial court did not err in treating Dorothy's counterclaims as defenses and denying her a jury trial on those defenses. *See* Rule 8(c), N.D.R.Civ.P.

■ Dorothy next asserts that the trial court erred in excluding evidence at trial. Dorothy attempted to elicit testimony from a Bank loan officer, who was not involved in handling Dorothy's loans, regarding whether he had ever "welshed on deals" with other Bank customers. The trial court sustained the Bank's objection to the testimony, stating that "[i]t appears to me you might be getting into collateral matters with this line of inquiry." The trial court also excluded the testimony of another witness who, according to Dorothy's counsel, would testify regarding "another incident where the Bank did not treat a customer right." The trial court excluded the evidence "because its probative value, if any, is substantially outweighed by the confusion of the issues and by consideration of delay and waste of time and that sort of thing."

■ Rule 403, N.D.R.Ev., provides that relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, or misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence. The rule vests wide discretion in the trial court to control the introduction of evidence at trial and our review is limited to determining whether that discretion was abused. *Williams Cty. Social Services Bd. v. Falcon*, 367 N.W.2d 170 (N.D.1985). A trial court abuses its discretion when it acts in an arbitrary, unreasonable, or unconscionable manner. *Fleck v. Fleck*, 337 N.W.2d 786 (N.D.1983).

In this case, Dorothy's proffered evidence was collateral to these lawsuits and its relevance was questionable. Assuming, only for purposes of discussion, that the evidence might be properly admissible as other crimes, wrongs, or acts under Rule 404(b), N.D.R.Ev., we cannot say that the trial court abused its discretion in disallowing the evidence under Rule 403 standards.

■ Dorothy further asserts that the trial court erred in finding that the Bank did not commit fraud against her or breach any duty it owed to her. We disagree.

■ The party alleging fraud must prove it by evidence that is clear and convincing. *Norwest Bank Bismarck v. Faiman*, 420 N.W.2d 357 (N.D.1988); *Benefiet v. Hoiby*, 370 N.W.2d 513 (N.D.1985). Whether fraud exists is treated as a question of fact, and the trial court's determination of that issue will not be set aside on appeal unless it is clearly erroneous. *D.G. Porter, Inc. v. Fridley*, 373 N.W.2d 917 (N.D.1985).

Dorothy's claim of fraud is premised on her assertion that the Bank had a duty to disclose to her that she was mortgaging property to secure notes which were criticized by federal bank examiners and were internally classified by the Bank as problem loans. She asserts that she was not aware of the status of the partnership loans, that she was not knowledgeable in financial transactions, and that she was unaware that she had even signed a mortgage on the farm property. She asserts that she placed her trust and confidence in the Bank and, because she was in an inferior position, the Bank owed her a duty to disclose the risks she was taking.

■■ We recognized in *Hellman v. Thiele*, 413 N.W.2d 321 (N.D.1987), that a bank generally has no affirmative duty to disclose a customer's financial condition to anyone. A duty to impart full, accurate, and truthful information may arise if a bank responds to an inquiry about a customer's credit status. *Ostlund Chemical Co. v. Norwest Bank*, 417 N.W.2d 833 (N.D.1988). A duty of disclosure may also arise if a fiduciary relationship exists. *See Centerre Bank of Kansas City v. Distributors*, 705 S.W.2d 42, 53 (Mo.Ct.App.1985) [in fraud case, absent fiduciary relationship, bank had no duty to disclose its internal classification of loan as a "problem loan" to subsequent guarantors of that loan]. In *Union State Bank v. Woell*, 434 N.W.2d 712, 721 (N.D.1989), we said:

"The relationship between a bank and its customers is viewed as a debtor-creditor relationship which does not ordinarily impose a fiduciary duty upon a bank. *See Faith, Hope and Love, Inc. v. First Alabama Bank*, 496 So.2d 708, 711 (Ala. 1986); *Umbaugh Pole Bldg. Co., Inc. v. Scott*, 58 Ohio St.2d 282, 390 N.E.2d 320, 323 (1979). Some courts have recognized that a fiduciary relationship may arise under circumstances which reflect a borrower's reposing of faith, confidence and trust in a bank with a resulting domination, control or influence exercised by the bank over the borrower's affairs. *See In Re Red Cedar Const. Co., Inc.*, 63 B.R. 228, 242 ([Bkrtcy.] W.D.Mich.1986); *Nicoll v. Community State Bank*, 529 N.E.2d 386, 389 (Ind.Ct.App.1988). Furthermore, the borrower or party reposing the confidence must be in a position of inequality, dependence, weakness, or lack of knowledge. *Nicoll v. Community State Bank, supra; see also Stenberg v. Northwestern Nat'l Bank of Rochester*, 307 Minn. 487, 238 N.W.2d 218, 219 (1976)."

Whether a fiduciary relationship exists is generally a question of fact, dependent upon a showing of special circumstances. *Production Credit Ass'n of Fargo v. Ista*, 451 N.W.2d 118 (N.D.1990).

The trial court essentially determined that Dorothy was not inexperienced or unknowledgeable in financial transactions, especially those concerning her son. The court found that Dorothy had previously assisted Rodney in his financial dealings by signing a $46,000 promissory note and mortgage of the farm property in 1979 to enable him to secure financing at the Williston Cooperative Credit Union and that she understood she would have to make the annual payments if Rodney failed to do so. She also executed a $15,000 guaranty of Rodney's debts at the Bank in 1980. The court found that the occasions when Dorothy gave financial assistance to her son were initiated by Rodney's asking for assistance and her agreeing to it. Dorothy also signed financial statements on several occasions during 1986 and 1987 in which she acknowledged her mortgage debt to the Bank.

The trial court also found that the loan officers explained the terms and conditions of the loans and mortgages. The trial court found "little or no evidence" that Dorothy asked the Bank any questions about the papers she was signing. The trial court also found that the Bank did not fail to answer any of her questions or inquiries; nor does the record reflect that Dorothy asked the Bank about the status of the partnership's business loans. There is also evidence in the record that in March 1986 both the Bank and the partnership were confident that the debt could be paid off because the mall was generating sufficient cash flow at that time. Moreover, the

Bank introduced evidence that the federal bank examiner's report was confidential and that any disclosure to persons not officially connected with the Bank would subject it to penalties under federal law. There is no evidence to suggest that the Bank exercised any dominion or control over Dorothy's affairs.

The evidence in the record and the trial court's findings, which are supported by that evidence, do not establish that the Bank owed Dorothy a duty, fiduciary or otherwise, to disclose to her its internal classification of the partnership's loan status. There is ample evidence to support the trial court's finding that the Bank did not commit fraud. The trial court's findings are not clearly erroneous.

■■■ Finally, Dorothy asserts that the trial court erred in determining that there was consideration given for her execution of the two notes and mortgages. She contends that no consideration existed because, within a 40–day period, she "signed two ... mortgages but didn't receive one ... dime from the Bank."

■■■ Good consideration to support a contract may consist in a benefit to the promisor or a detriment to the promisee. *First State Bank of Buxton v. Thykeson*, 361 N.W.2d 613 (N.D.1985); § 9–05–01, N.D.C.C. Detriment, as used in a contractual context, means giving up something which the promisee was privileged to retain, or doing or refraining from doing something which he was privileged not to do, or not to refrain from doing. *Harrington v. Harrington*, 365 N.W.2d 552 (N.D. 1985).

It is well established that consideration for a mortgage need not move directly from the mortgagee to the mortgagor but may consist of a loan to a third person, and that a benefit to a third person constitutes sufficient consideration for an agreement. *E.g., State Bank of Geneva v. Sorenson*, 167 Ill.App.3d 674, 118 Ill.Dec. 305, 521 N.E.2d 587 (1988); *Huntingburg Production Credit v. Griese*, 456 N.E.2d 448 (Ind. Ct.App.1983); *Matter of Rose*, 17 B.R. 55 (Bkrtcy.W.D.Ark.1981); 55 Am.Jur.2d *Mortgages* § 100 (1971). "Where one

makes his own note payable at a future time in discharge of the past-due note of a third person, the release of a third person and extension of time of payment form a sufficient consideration to support the new note and a mortgage made to secure it...." 59 C.J.S. *Mortgages* § 91, at p. 137 (1949) [Footnote omitted].

The mortgages executed by Dorothy secured loans which were consolidations of previous loans made to Rodney and Ron, many of which were past due. The notes were renegotiated with different terms, such as granting additional time to pay, or containing different rates of interest. The Bank gave up collection rights on the previous notes in exchange for the new notes and mortgages. There was sufficient consideration for the mortgages in this case.

The judgments are affirmed.

ERICKSTAD, C.J., and GIERKE, LEVINE and MESCHKE, JJ., concur.